PETER F. CONNOLLY COMPANY, Claimant, v. THE STATE OF NEW YORK, Defendant.

Claim No. 15633.

Court of Claims, March, 1923.

*Claims against state — highway construction contract — when delays caused by city no basis for claim against state.*

CLAIM for breach of highway construction contract.

*Joseph A. Murphy*, for claimant.

*Charles D. Newton*, attorney-general (*Henry P. Nevins*, deputy attorney-general), for State of New York.

*Boyd McDowell*, city attorney, and *Michael Danaher*, corporation counsel, for City of Elmira.

SMITH, J. This claim has been filed to recover damages for the alleged breach by the state of a highway construction contract. Claimant is a contractor and in the year 1916 entered into an agreement in writing with the state, pursuant to the provisions of the Highway Law, for the construction of the Elmira-North Elmira County Highway No. 1378, four and fourteen one-hundredths miles in length, in the county of Chemung. One and nineteen one-hundredths miles of this highway were to be, and were, constructed within the city of Elmira, and its type was a brick pavement resting upon a concrete foundation or base.

Next northerly from the brick pavement, for a distance of one and forty-seven one-hundredths miles, the contract provided for a bituminous macadam road, and next northerly from that a waterbound macadam road for a distance of one and forty-eight one-hundredths miles. The brick pavement was entirely within the city of Elmira, in College avenue, West Thurston and Davis streets, and the bituminous and waterbound macadam parts were wholly outside said city.

It is not claimed that the state committed any breach of its contract or failed in any duty with reference to those parts of the work which were outside the city of Elmira. The claim is that in the performance of that part of its contract which lay within the city, claimant was interfered with, hindered and delayed, the cost of performing the contract being greatly increased, by reason of installing certain sewers, water and gas mains and service connections which were being carried on in the city streets by the city and others under the direction and with permission of the city authorities, the effect of which was to withhold from claimant full possession of the site of the contract.

No active interference on the part of the state is alleged or proven or, in fact, claimed by claimant, whose claim rests solely upon the charge that the state failed to make the city streets available to it to the extent it claims it was entitled for the proper and economical performance of its contract.

The common council of the city of Elmira had, on May 8, 1916, prior to the letting of claimant's contract, and in the manner provided by statute, requested the state commission of highways to construct a county highway, or part thereof, in College avenue, West Thurston and Davis streets in that city, agreeing to pay a stipulated proportion of the cost thereof, and further agreeing to have all

sewer, gas and water mains and connections therewith laid in said streets prior to the date of the award of the contract for construction.

In pursuance of this request and agreement, which was granted, approved and accepted by the state commission of highways, the commission proceeded to let the construction contract.

The city did not perform its agreement to have all sewer, gas and water mains and connections therewith laid in the streets prior to the award of the contract for construction of the improved highway, which default was known to the state commissioner of highways before claimant had signed the contract, July 11, 1916, and to claimant before the contract had been signed by the state commissioner and delivered to claimant and thereby rendered effective, September 6, 1916. In fact claimant, with full knowledge that certain sewer work was necessary to be done, and was actually then being done by the city, on September 5, 1916, wrote the highway commission urging it to sign the contract and deliver it to claimant, and stating that claimant could and would do considerable work on the northerly end of the contract that fall, and that that work " would not interfere with the brick end where the city of Elmira is doing some sewer work."

After receiving claimant's letter of September 5, 1916, the state commissioner, on September 6, 1916, signed the contract on the part of the state and on the same day advised claimant of the fact by letter, which also notified claimant that it might start the work.

Under date of August 8, 1916, before claimant had taken any step whatever toward the performance of its contract, or incurred any expense, the city of Elmira, by its mayor, made application to the state commission of highways for permission, under section 146 of the Highway Law, " to lay 10, 12, 15 inch main sewers on and across " county highway No. 1378, in accordance with a map and plan which the application stated was thereto attached and formed a part thereof, but which it seems has not been introduced in evidence in this case. In this application it was stipulated that if the permit were granted, the work thereunder should be commenced within ninety days from the date of the permit and continued in an expeditious manner.

This application when presented to the state commission of highways bore the following indorsement, viz.:

" We hereby consent to the granting of the above requested permit, providing that the performance of the work herein referred to does not result in our being held liable for any future repairs to these highways, necessitated by the operations of the applicant.

" (Signed)    PETER F. CONNOLLY Co.

" By PETER F. CONNOLLY, *Treas.*

" Contractor Road No. 1378."

This consent of claimant to the granting of the sewer permit was given nearly a month before the contract had become effective by the signature of the state commissioner of highways, and to that extent qualified any agreement, express or implied, on the part of the state as to delivery to claimant of the site of the contract.

The application for permit was granted by the state commission of highways on September 29, 1916.

Prior to the granting of the permit a conference had been held at the office of the state highway department, on September 20, 1916, at which were present the state commissioner of highways, his first deputy, Mr. Breed, the division engineer, Mr. Edwards, Mr. F. H. Hill, representing the Elmira Light and Railway Company, Mr. Clearwater, county superintendent of highways, the chairman of the highway committee (probably of the board of supervisors), Mr. Dow of the department of public works of the city of Elmira, and Peter F. Connolly, president and treasurer of claimant, contractor. At this conference it was understood and agreed that the city should lay the main sewer, at least, and that claimant would defer its work until the sewer work was finished.

Following this conference, as above stated, and as the result thereof, the state commission of highways granted the application of the city for the sewer permit.

In this connection it may be well to note that section 146 of the Highway Law had no application to this highway in its uncompleted state, and hence a permit from the state commission of highways to install the sewers was unnecessary. *People* v. *Delaware & Hudson Co.*, 183 App. Div. 149, 153; 228 N. Y. 279, 287.

It thus appearing that claimant accepted and agreed to the conditions existing with respect to the installation of the main sewers, both before and after the construction contract had become effective and binding on both parties by the signature of the state commissioner of highways, it had thereafter no just cause or foundation for complaint that the state, by reason of the main sewer installation, had withheld from it the site of the contract.

In addition to the main sewers certain house service sewer connections were likewise installed by the city, and these were not installed until the summer of 1917. The house services were, I think, embraced within and covered by the consent and permit for the installation of the main sewers, not in express terms but by necessary implication. The main sewers were sanitary sewers and could be useful for the purpose for which designated only if and when service connections with the properties along the street had been effected. This was within the knowledge of and must have been contemplated by all parties to the transaction.

A brick pavement was to be laid upon a concrete base, under-

neath which the main sewers were to lie. The understanding and agreement was that the sewers were to be laid first, of course, to obviate the necessity and expense of tearing up the completed pavement in order to lay the sewers. Realizing, as all must have, that the house services were as necessary as the main sewers if the latter were to function, it is not conceivable that any of them could have overlooked or failed to foresee that the installation of the house services must of necessity be performed as an essential element of the sewer system, and that too before laying the brick pavement. The conclusion that it was understood and intended by all that the consent and permit for the main sewers should and did include the house services seems inescapable.

However, if this is not so, then the state has not given any permit or consent to install the house service sewer connections and these are in the same case as the gas and water pipes which will presently be considered.

On March 26, 1917, the state commission of highways, on the application of the Elmira water board and with the consent of the contractor, granted a permit for the installation of a small stretch of water main in Oakwood avenue, village of Elmira Heights, and on September 6, 1917, it granted a permit for the installation of four three-quarter-inch water service connections near the corner of College avenue and West Thurston street, upon the like consent of the contractor, in both instances the consent being in writing indorsed upon the back of the application for the permit. The work done by virtue of these two permits is not claimed by claimant to have caused any interference or delay, and its claim is in no respect founded upon it.

On March 26, 1917, and on May 23, 1917, respectively, the state commission, on the application of the Elmira Water, Light and Railroad Company, granted two permits for certain railroad construction in West Thurston street. Claimant consented to the granting of both of these permits and expressly disavows any claim for hindrance or delay because of the work performed thereunder. In fact a large part of this work was performed by claimant pursuant to contract with the railroad company and presumably it was profitable to it.

The record does not disclose that any other permits for the performance of work in the city streets were granted by the state commission of highways or that it had any part in or connection with any such work.

It appears, however, that in the late spring and early summer of the year 1917 the city of Elmira, acting by and through the agency of its water board, caused to be laid a short stretch of water main in Davis street in said city, and numerous house service connections

with its water mains in College avenue, West Thurston and Davis streets, and the Elmira Water, Light and Railroad Company, by direction of the city authorities, laid numerous house service connections with its gas mains in said streets. It is upon these works, together with the house sewer services, that claimant lays greatest stress as constituting the withholding from it, or as making unavailable to it, the contract site, resulting in great damage by way of increased cost of performing its contract. It is claimed that the state is responsible for such interference as was caused by these works for the reason that it failed and neglected, after complaints had been made by claimant, to revoke such permits as had been granted and to deliver to claimant the site of the work.

In support of this contention two paragraphs or provisions, common to all of the permits which the state had granted, are cited, viz.:

" 1. The work authorized by this permit shall be performed under the supervision and to the satisfaction of the state commission of highways and its representative.

" 2. The said state commission of highways reserves the right to at any time revoke or annul this permit should the said company fail to comply with the terms and conditions upon which it is granted."

When it is remembered that the state had granted no permit for the gas or water pipes, or for the house sewer services as a separate work, the fallacy of claimant's contention at once appears. The state could not revoke permits for these works, for there were no permits to revoke. It had no supervision over these works for the reason that, as to them, there was no agreement or provision of statute giving it supervision. It is true that the state had its representative on the ground supervising the highway construction, but the evidence does not reveal that he exercised any control over, or participated in any way in the installation of the water, or gas pipes, or house sewer services.

Nor is it pointed out in what practical way the state could have ousted the city and the water, light and railroad company from the city streets so as to deliver undisturbed possession of the streets to claimant.

Forcible eviction without process of law was, of course, out of the question, and it is by no means clear that the courts would have granted injunctive relief.

The streets of the city were under the dominion and control of the city authorities. The necessity for the construction of sewers and water mains and the matter of installation of gas and water pipes are city problems committed by law to the judgment and control of the city authorities. Matters such as these directly

and considerably affect the health and comfort of the people of the city, and jurisdiction over them is very properly bestowed by law upon the local authorities. Section 146 of the Highway Law assigns to the state commission of highways no jurisdiction or control over city streets unless and until those streets have been improved by the state as parts of a state or county highway, and the work of improvement completed (*People* v. *Delaware & Hudson Co.*, 183 App. Div. 149, 153; 228 N. Y. 279, 287), at which time such limited jurisdiction and control as is conferred by that section attaches.

In this situation it is not to be assumed that the courts, at the suit of the state, would have ousted the city from its streets and forced upon it the unwise and improvident expedient of installing its sewers, water and gas pipes underneath a brick pavement laid upon a concrete base, after the pavement work had been completed.

It is true that the city authorities had agreed to have all sewer, gas and water mains and connections therewith laid in the streets prior to the date of the award of the highway construction contract, which agreement it had failed to perform. It is likewise probably true that, for its default, the city would be held liable in damages in an appropriate action brought for that purpose by the contractor to the extent that the contractor had not waived its rights. In any event the courts were as open to claimant as to the state for an effort to evict the city from its streets and it failed to make the effort. It did not even ask the state to evict the city, though it did complain of the slow progress of the city's work and request the state to urge the city officials to expedite their work, a request which was complied with in every case, so far as the record shows.

The evidence discloses no instance of breach of duty on the part of the state with respect to the sewer, water or gas mains or services, and for such damage, if any, as claimant may have sustained, as the result of any of such work, the state is not liable.

Furthermore the evidence falls far short of establishing that claimant has sustained any such damage.

The damages, as claimed, may be divided into two classes with reference to the periods of time within which they are claimed to have been sustained, viz., those sustained during the months of January, February and March, and perhaps April, 1917, and those sustained after September 1, 1917. Claimant has so classified them.

No claim is made because of delay on the part of the state in signing the contract, from July 11, 1916, to September 6, 1916; in fact if such claim were made it would not be valid. *Belnar Contracting Co.* v. *State of N. Y.*, 110 Misc. Rep. 429; 233 N. Y. 189.

Nor is claim made for inability of claimant to obtain possession of the site of the contract prior to January 1, 1917. In fact it is conceded that prior to the last days of December, 1916, claimant with its plant was engaged in the performance of another contract in the state of Pennsylvania and that its plant was not moved to the vicinity of this contract until a very few days prior to January 1, 1917.

It is claimed, however, that after January 1, 1917, and during the winter months then ensuing, claimant had intended receiving delivery of brick for the pavement of College avenue, West Thurston and Davis streets in the city of Elmira, and, utilizing its teams and employees then available, hauling the brick to the streets to be paved, alongside of which they would be piled and stored until such time as they would be needed to be placed in the pavement. By this course, it is claimed, claimant would have been able to obtain a concession of one dollar per thousand in the cost of the brick, in addition to which, it is claimed, claimant's teams and men would have been by such work profitably employed, whereas, because of weather conditions, there was no other work of the contract upon which they could be employed during the winter months. The claim is made that this purpose of claimant was defeated by reason of the fact that the city services, water sewer and gas, had not then been installed, and that until the services had been installed, there was no available space along the streets in which to pile and store the brick, or at least that claimant did not and could not know what space was available for its purpose unless and until the proposed locations of the services were indicated by the city authorities, which was not done.

The number of brick upon which it is claimed the saving in cost of one dollar per thousand could have been made is placed at 600,000, and the value of the use of the teams and organization of which claimant claims to have been thus deprived is placed at $993, a total of $1,593 for this branch of the claim.

There are three answers to claimant's contention in this regard, any one of which is sufficient to defeat it.

In the first place claimant had no absolute right to cumber the streets of the city with piles of brick during the winter months, there to be kept and stored until some months thereafter, when it might elect to place them in pavement, nor has it shown any intelligent effort to obtain from the city or state authorities permission so to store its brick, or assignment of space for that purpose, or information as to the proposed location of the services. Secondly, the evidence establishes that there was abundant space along the streets which might have been utilized for the storage of the brick, with the consent of the city authorities, without

interfering with, or being interfered with by, the proposed service installations, and that for the utilization of that space knowledge of the exact location of the proposed services was unnecessary. Lastly, it should be remembered that claimant had written the state commission of highways on September 5, 1916, before the latter had signed the contract and as an inducement to its signing, that it would begin performance of its contract on that part thereof which lay outside of the city of Elmira, and that such course would " not interfere with the brick end where the city of Elmira is doing some sewer work."

It is of significance that when claimant did in fact haul its brick to the site of the contract it did not use teams for the purpose but delivered them by car directly upon the work, obviously a more economical method.

The other class of damage, viz., that claimed to have been sustained after September 1, 1917, embraces increased cost of materials, viz., sand, gravel and cement, plant rental for ten months, increased cost of labor, expense of procuring laborers, cost of maintaining warning lights about its work, cost of rehandling material, increased freight rates on materials, war tax on freight bills, expense of keeping organization during winter of 1917–1918, increased cost of horse feed and other materials, demurrage, premium on contract bond, extra workmen's compensation, amounting in all to $30,812.29.

It is not claimed that any of the causes of these items of alleged damage occurred after September 1, 1917. The claim is that in the conditions existing in the year 1917 claimant, with the plant and organization which it had on the work, could have completed the work on or before September 1, 1917, the date limited in the contract for its completion, but that because the work of the city and railroad company, in installing the sewers, water and gas pipes, and connections, all of which was completed before June 1, 1917, hindered, interfered with and delayed claimant in performing the work of its contract, that work was not completed until long after September 1, 1917, and then at a cost greatly increased over what it would have been had the work progressed without such hindrance, interference and delay.

The only support this proposition has in the evidence is the statement of such an opinion or conclusion by Peter F. Connolly, claimant's president and treasurer, which is not sustained by the proven facts as to which there is no dispute. Connolly himself testified that there was no interdependence between that part of his contract work to be performed within the city of Elmira and that to be performed outside the city. This is in harmony with the letter which he wrote the state authorities on September

5, 1916, urging the signing and delivery of the contract agreement by the state, in which he urged that he could begin work on the part of the contract outside the city, which course would not interfere with the sewer work of the city. Connolly also testified that the work outside of the city was not interfered with during its progress by any of the city work.

Claimant knew with the opening of spring in 1917 that the city services had not been installed. Its excavation plant was at Horseheads, near the northerly limit of the contract. Mr. Connolly testified that weather conditions did not permit commencement of excavation or grading work in the spring of 1917 before about the middle of April. Grading outside the city was actually commenced on April 12, 1917, and claimant did not enter the city to do any grading work until the week ending May 18, 1917, when the work was started on the east side of College avenue.

On that date a large part of the grading outside of the city remained unperformed and there was no effort on the trial to show what advantage, if any, there was in transferring the grading operations to the city areas, or disadvantage in continuing to use the grading plant and force on the work lying outside the city. However, on that date all city work on the east side of College avenue had been completed and from that point forward claimant's work proceeded without any collision with or slowing up on account of the city's work, which was at all times well ahead of claimant's progress, as Connolly himself has testified.

Mr. Connolly claims, however, that had it not been for the city's work he would have performed excavation work within and without the city at the same time, in which case he would have been able to commence the grading within the city on April twelfth instead of during the week of May eighteenth. This is the sole basis for his complaint. There was, however, no attempt to show how advantage to the contractor would result from that method. The length of the whole contract was four and fourteen one-hundredths miles of which only one and nineteen one-hundredths miles lay within the city. Surely the contractor was not cramped for areas in which to employ his grading equipment and organization.

The grading operations were performed by means of scrapers hauled by a traction engine. Claimant had but one traction engine, which could not be employed on both northern and southern extremities of the contract at one time. The grading work was actually started at the northern limit of the contract and when, the grading work outside the city remaining unfinished, claimant removed its grading plant to within the city, it encountered no obstacle or interference to prevent freedom of progress with its work. The evidence fails to disclose any interference with claim-

ant's work by the work of installing the sewer, water or gas mains or services, or any delays or slowing up occasioned thereby.

It is no doubt true that the performance of this contract during the war time period was slower and more costly than claimant had anticipated, but, of course, for such embarrassments and losses as were occasioned by war time conditions the state is not responsible.

Had claimant suffered damages because of interference of the nature complained of, there has been a settlement between the parties and claimant has been paid the full amount found to be due on such settlement.

The original contract provided that the work should be completed on or before September 1, 1917, and that ten dollars per day should be paid by the contractor to the state, as liquidated damages for each day after September 1, 1917, during which the work remained unfinished.

The work was actually finished July 12, 1918, 285 days after the contract completion date. On the face of things this situation would entitle the state to deduct $2,850 from the final payment to the contractor. It does not appear, however, that the state commissioner of highways ever asserted this right or made claim to the right to assert it.

It appears that on or about September 17, 1918, claimant presented a claim against the city of Elmira for excess cost of performing his contract in the amount of $17,329.83, of which fact the mayor of the city notified the state commissioner of highways by letter under date of September 17, 1918. The nature of such claim, except that it was for " excess cost " does not appear in the record.

Claimant presented no such claim to the highway department of the state, nor so far as the record shows intimated in any way to the highway department that it claimed the right to recover damages against the state.

Claimant did, however, on October 4, 1918, file with the attorney-general and with the clerk of this court a notice of its intention to file this claim, and the claim itself was filed on October 9, 1918. It does not appear whether or not the fact of the filing of the claim was brought to the knowledge of the department of highways prior to the preparation of the final estimate for this contract and the execution of the final supplemental agreement now to be considered.

The final estimates, two in number, one covering the city's share of the work and the other covering the state and county share were prepared as of October 5, 1918, and bear that date, though they were not verified by the division engineer until January

17, 1919, or approved by the state commissioner of highways until January 25, 1919. These final estimates are made up to show the aggregate quantities of all work and materials furnished by the contractor, the item prices therefor, the aggregate amounts earned by the contractor for such work and materials, the amount previously paid on account thereof, and the balance remaining unpaid to which the contractor is entitled. The estimates also showed the amount of balance due the contractor on account of the state and county share to be $4,689.31 and on account of the city share $5,864.82, a total of $10,554.13. Of this total $2,086.99 was, pursuant to the terms of the contract, to be temporarily withheld from the contractor, as a guaranty fund, the amount presently payable to the contractor being, therefore, $8,467.14.

These final estimates were made in conformity with two supplemental agreements between claimant and the state which, like the estimates, bear date October 5, 1918. It does not appear on what date they were signed by the claimant, if they were not signed on the day they bear date, but they were not approved by the comptroller and signed by the state commissioner of highways until January 24, 1919, one day before the approval of the final estimates by the state commissioner of highways. These schedules in the supplemental agreements agreed exactly with the schedules of the final estimates.

These agreements, one covering the city's share of the work and the other the state and county share, are identical in form, differing only as to the schedules of work performed and material furnished on the parts of the work to which they relate, the schedules agreeing exactly with the schedules set forth in the final estimates.

The agreement relating to the city's share of the work, omitting the schedule, is as follows:

" COUNTY HIGHWAY      City Share
" (Covering Final Supplemental Agreement)

" ARTICLES OF AGREEMENT made this 5th day of October, 1918, between Peter F. Connolly Company, party of the first part, and the State of New York, party of the second part, to be attached to and form a part of the contract between the parties hereto, dated the 11th day of July, 1916, pursuant to Chapter 30, Laws of 1909.

" For the improvement of the Elmira-North Elmira, County Highway, No. 1378, County of Chemung.

" *Witnesseth:*

" The party of the second part, The State of New York, represented by the State Commission of Highways, hereby agrees to pay the

55

party of the first part, The Peter F. Connolly Company, the prices hereinafter mentioned for the quantities of labor and material actually ordered and performed in the same manner as is provided for the monthly payments in the contract hereinbefore referred to.

"The party of the first part, The Peter F. Connolly Company, hereby agrees to furnish all the quantities of labor and material hereinafter described at the prices hereinafter mentioned in accordance with the terms of the original contract, the requirements contained in this agreement and the orders of the State Commission of Highways, and in consideration of not being required to furnish the items deducted by this agreement and which were found to be unnecessary for the proper completion of the work hereby consents to the deduction of said items."

Though these agreements are in language appropriate for use with reference to work yet to be performed, they in fact relate to work then fully performed. All of the conditions under which the work was performed were then known to both parties. Both knew that the work had not been completed within the time fixed by the contract, and both knew of such delays as there had been and how occasioned. There had been increases in quantity of certain classes of work and decreases in others, and both had knowledge of this as well.

The state commissioner of highways refrained from asserting a claim for damages for delay in completing the work and the contractor did not assert any claim for damage for interferences or demand any increased compensation on account of increased cost of performance, due to hindrances, interferences or otherwise.

By these agreements claimant agreed to accept the amount shown by the final estimates to be its due for the performance of the work under the conditions it had actually encountered.

On January 30, 1919, that amount was paid to claimant and claimant gave its receipt therefor which contains no reservation of any claim for damages or intimation of intention to make any such claim.

In these circumstances it must be held that claimant has waived whatever claim it may have fancied it had based upon the conditions under which the work of its contract was performed, while the state has waived its claim to liquidated damages for failure to perform within the contract time.

The claim should be dismissed on the merits.

ACKERSON, P. J. (concurring). I concur with my associate Judge Smith in the conclusion that he has reached that this claim must be dismissed. I cannot agree with him, however, in the proposition that if the claimant had a just claim against the state for damages

because of delays for which the state could be properly held responsible, such claim was waived by reason of the execution of the two supplemental agreements bearing date October 5, 1918, and the execution and delivery of the receipt on January 30, 1919, for the money claimant was entitled to in accordance with such agreements, without making any reservation for a claim for damages in such receipt.

I do think it is clear, however, that the evidence in the case is insufficient to sustain the claimant's contention that it is entitled to an award for damages against the state.

Judgment accordingly.